UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Stacy L. Feeney and
Francis P. Feeney

   v.                                      Civil No. 05-cv-461-JD
                                                  Opinion No. 2006 DNH 047
Edith Kressy et al.


O R D E R

Defendant Ann Flanagan has moved to dismiss this action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and, in the alternative, to dismiss the plaintiffs' claims against her for failure to state a cause of action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The plaintiffs, Stacy L. and Francis P. Feeney, object. None of the other defendants has responded to Flanagan's motion.


Background

This action arises out of the Feeneys' unsuccessful efforts to buy a parcel of land in Holderness, New Hampshire, owned by three sisters, Jean Murphy, Ann Furbush, and Margaret Wood (the "sellers"). Defendant Edith Kressy, a real estate broker, showed the property to the Feeneys in late December 2002, pursuant to an exclusive listing agreement between Murphy and Kressy's agency, Kressy Real Estate, Inc. This agreement obligated the owner, listed as "Furbush, Murphew [sic] and Wood," to pay Kressy Real Estate a five percent commission on the sale of the property, but

was signed only by Murphy.  The Feeneys and Kressy, meanwhile, signed a disclosure form indicating that Kressy was acting as the Feeneys' agent.

On January 1, 2003, the Feeneys entered into a written agreement with Murphy and Furbush to buy the property for $425,000 (the "purchase and sale agreement").  On January 3, 2003, however, the sellers received an offer to purchase the property from another buyer, Kevin Croteau, for $500,000.  The offer was communicated through defendant Lisa G. Plowden-Wardlaw, who had shown the property to Croteau through her co-defendant Robert Clark, an agent at Lamprey & Lamprey Real Estate, Inc.  None of these persons had a listing agreement with the sellers and Wardlaw "was not a licensed agent or broker for Lamprey & Lamprey at that time."  Compl. ¶ 21.  That same day, the sellers told Kressy that they did not want to pay her five percent commission, and that Wood would not sign the purchase and sale agreement as a result.

The sellers also contacted the Feeneys, telling them about Croteau's offer and proposing that the Feeneys buy the property for either $500,000 or $470,000 plus payment of Kressy's commission.  The sellers also said that they wanted to "get out" of the purchase and sale agreement.  Wardlaw called the Feeneys the next day and gave them the same news.

On January 6, 2003, the Feeneys called Flanagan, an investigator with the New Hampshire Real Estate Commission, to

inquire about Wardlaw's conduct.  Flanagan told them "that Wardlaw would be violating the rules if she was bringing offers to a seller without a listing agreement and while her license was not listed with an authorized agency."  Compl. ¶ 26.  Flanagan then "spoke to the Sellers by telephone and provided advice to them regarding the transaction" and "reviewed documents from the Sellers pertaining to the transaction."  Id. ¶¶ 27-28.

The Feeneys allege that "[u]ltimately, based on the illegal interference from defendants Wardlaw, Clark, Lamprey & Lamprey, and Flanagan, the Sellers elected to rescind their acceptance of the Feeneys' offer to purchase the property."  Id. ¶ 29.  They also allege that, on January 23, 2003, Flanagan "told the Sellers she had potential buyers who were interested in the property" and threatened Kressy Real Estate with the loss of its license if it failed to remove the purchase and sale agreement from the registry of deeds, where it had been recorded.  Id. ¶ 30.  The sellers later sold the property for $565,000, though the complaint does not identify the purchaser.

Before bringing this lawsuit, the Feeneys filed an action in state court for specific performance of the purchase and sale agreement, "but the Court would not enforce the agreement due to the Statute of Frauds."  Id. ¶ 32.  The Feeneys have sued Kressy and Kressy Real Estate for breach of contract and Plowden, Clark, Lamprey & Lamprey, and Flanagan for interference with prospective contractual relations.  They have also charged all the defendants

with violating the New Hampshire Consumer Protection Act, Revised Statutes Annotated ("RSA") 358-A.

The Feeneys claim that Flanagan, despite her awareness of their "prospective contractual relations with the Sellers," told them "that she thought they should hold out for a higher price or perhaps develop the Property themselves" and that "she had people who were interested in the property." Compl. ¶¶ 44-45. The complaint alleges that this "conduct caused the sellers to renege on their agreement with the Feeneys and such conduct constituted an illegal interference with the Feeneys' prospective contractual relations with the Sellers." Id. ¶ 46. The Feeneys further assert that Flanagan violated RSA 358-A through this behavior, as well as by "abusing her governmental cloak of authority" and "committing other illegal acts and violations of the real estate code of ethics." Id. ¶ 56. Although the Feeneys allege that Flanagan committed these acts "willfully and knowingly," they seek only their "actual damages," attorneys' fees, and costs, id. ¶¶ 56-57, rather than multiple damages as provided by the Consumer Protection Act, see RSA § 358-A:10.

I. Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Feeneys have invoked this court's diversity jurisdiction, characterizing this suit as between citizens of different states with an amount in controversy in excess of

4

$75,000.  28 U.S.C. § 1332(a)(1).  The parties agree that the Flanagans are citizens of Massachusetts while all of the defendants are citizens of New Hampshire.  Flanagan, however, has questioned whether the amount in controversy in fact exceeds $75,000, so the Feeneys have "'the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount.'"  Stewart v. Tupperware Corp., 356 F.3d 335, 338 (1st Cir. 2004) (quoting Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001) (further internal quotation marks omitted).

"Although the value of the matter in controversy for purposes of federal jurisdiction is generally determined by applying federal standards, the federal court must examine state law to determine the nature and the extent of the damages to be awarded."  16 James Wm. Moore et al., Moore's Federal Practice, § 107.14[2][g][iii], at 107-77 (3d ed. 1997); see also Stewart, 356 F.3d at 339.  Provided a plaintiff's claims are "colorable," the court's inquiry does not focus on their probable success but rather on "whether to anyone familiar with the applicable law [the] claim could objectively have been viewed as worth" the jurisdictional minimum.  Jimenez Puig v. Avis Rent-A-Car Sys., 574 F.2d 37, 40 (1st Cir. 1978).

A would-be purchaser claiming breach of a contract to convey real property can recover the difference between the price stated in the contract and the value of the property at the agreed-upon

time for conveyance.  Lupin v. Rousseau, 98 N.H. 459, 460 (1954); Hurd v. Densmore, 63 N.H. 171 (1884); 17 Charles Szypszak, New Hampshire Practice: Real Estate § 3.04[D], at 59 (2003).  Based on their claim that Flanagan caused the sellers to back out of the purchase and sale agreement, then, the Feeneys argue that they can recover the difference between the price they would have paid for the property under the agreement, $425,000, and the price at which it ultimately sold, $565,000.  This figure, $140,000, surpasses the jurisdictional minimum.  Although Flanagan argues that the allegations of the complaint cannot support such a claim, see infra, these arguments do not affect the valuation of the claim for purposes of the jurisdictional analysis.  See, e.g., Coventry Sewage Assocs. v. Dworkin Realty Co., 71 F.3d 1, 5 (1st Cir. 1995).  The court therefore has subject matter jurisdiction over this action.

II.  Motion to Dismiss for Failure to State a Claim

As just noted, Flanagan argues that the complaint fails to state a claim against her for either tortious interference with prospective economic relations or violations of RSA 358-A.  "A complaint should not be dismissed unless it is apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  Stanton v. Metro Corp., 438 F.3d 119, 123-24 (1st Cir. 2006) (internal quotation marks omitted).  In ruling on a motion to dismiss for failure to

state a claim, the court must accept the well-pleaded factual allegations of the complaint as true, drawing all reasonable inferences in the plaintiff's favor. Id. at 123. "The court is free, however, to disregard bald assertions, unsupportable conclusions, and opprobrious epithets." Brown v. Credit Suisse First Boston LLC (In re Credit Suisse First Boston LLC), 431 F.3d 36, 45 (1st Cir. 2005).

### A. The Tortious Interference Claim

To prevail on a claim for intentional interference with prospective economic relations under New Hampshire law, a plaintiff must show that (1) he or she had an economic relationship with a third party, (2) the defendant knew of this relationship, (3) the defendant intentionally and improperly interfered with this relationship, and (4) the plaintiff was damaged by such interference. Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 40-41 (2005) (citing Demetracopolous v. Wilson, 138 N.H. 371, 373-74 (1994)). Flanagan contends in the first instance that the Feeneys have failed to allege that she improperly interfered in any relationship between them and the sellers. Specifically, she points out that the complaint charges her only with giving the sellers "advice" on the sale of the property, which she claims she had the right to do.

"New Hampshire . . . recognizes a privilege for a person to interfere with a contract by giving honest advice to a third

person."  Riblet Tramway Co. v. Ericksen Assocs., Inc., 665 F. Supp. 81, 87 (D.N.H. 1987) (citing Griswold v. Heat Corp., 108 N.H. 119, 126 (1967)).  As the Restatement explains, there is nothing "improper" about intentionally causing a third party to break off a contractual relationship by giving "honest advice within the scope of a request for the advice."  Restatement (Second) of Torts § 772(b) (1979).  Although the Feeneys acknowledge that New Hampshire recognizes this privilege, they argue that it does not shield Flanagan's communications with the sellers because, among other reasons, the complaint does not allege that they requested any such advice from her.

In accordance with the Restatement rule, this court has applied the "honest advice" privilege only where the advice was, first, given in response to a request from the third party and, second, did not exceed the scope of that request.  Riblet Tramway Co., 665 F. Supp. at 87-88; see also Wiswell v. Strafford County Dep't of Corrs., No. 92-cv-553-M (D.N.H. July 23, 1993), available at http://www.nhd.uscourts.gov; 1A Rudolf Callman, Callman on Unfair Competition, Trademarks & Monopolies § 9:8, at 9-150 (Louis Altman, ed., 4th ed. 1981 & 2003 supp.).  In addition, New Hampshire treats the privilege to advise as both an affirmative defense to be proven by the defendant and "a question of fact to be determined by a weighing of the factors involved." Griswold, 108 N.H. at 125; see also Baker v. Dennis Brown Realty, Inc., 121 N.H. 640, 644-45 (1981).

The complaint is silent on whether the sellers requested any advice from Flanagan or, if so, whether the advice she gave them was limited to their request. Thus, at this juncture, where the court must draw all reasonable inferences from the complaint in the Feeneys' favor, the court cannot rule as a matter of law that Flanagan's communications with the sellers were protected by the "honest advice" privilege.

Flanagan also contends that her actions could not have damaged the Feeneys, arguing that the sellers decided to back out of the deal because they received a better offer, not because of anything Flanagan told them. The complaint, however, alleges that the sellers "were trying to determine if they could get out of" the purchase and sale agreement as a result of the offer from Croteau, Compl. ¶ 23, but that they did not ultimately decide to dishonor the agreement until Flanagan and the other defendants intervened, id. ¶ 29. Generally, "whether the defendant's conduct caused the third person not to deal with the other raises an issue of fact." Restatement (Second) of Torts § 766 cmt. j (1979). At this stage in the proceedings, then, the complaint suffices to state a claim that Flanagan's allegedly improper actions brought the Feeneys' contractual relationship with the sellers to an end.[1]

---

[1] The fact that the purchase and sale agreement was ruled unenforceable by virtue of the statute of frauds does not bar the Feeneys' claim that Flanagan improperly interfered with their contractual relationship with the sellers. Restatement (Second) of Torts § 766 cmt. f (1979).

B.   The Consumer Protection Act Claim

The New Hampshire Consumer Protection Act proscribes "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. § 358-A:2  Flanagan argues that the complaint fails to state a claim against her under the Act because, inter alia, her alleged actions did not occur "in the conduct of trade or commerce." The Act itself provides that "'[t]rade' and 'commerce' shall include the advertising, offering for sale, sale, or distribution of any services and any property . . . ." Id. § 358-A:1, II.  Flanagan's alleged actions do not readily fit any of these categories.  In their objection to the motion to dismiss, the Feeneys seize on their allegation that Flanagan "told the Sellers that she had potential buyers who were interested in the property," Compl. ¶ 29, arguing that "the introduction of a potential buyer to a potential seller" constitutes "trade or commerce" within the meaning of the Act. Mem. Opp'n Mot. Dismiss at 10.

The complaint fails to allege, however, that Flanagan was "offering" her "services" in the sense that she expected a commission or some other form of remuneration for passing this information along to the sellers.  As the Supreme Judicial Court of Massachusetts has observed in construing the nearly identical definition of "trade or commerce" in that state's consumer

protection act,[2] "[t]he use of the words 'distribution of any services' in conjunction with words such as 'sale' . . . indicates an intent that the services be distributed in exchange for some consideration or that there must be other strong indications that the services are distributed in a business context."  Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc., 498 N.E.2d 1044, 1051-52 (Mass. 1986).  Indeed, absent such a limitation, the reach of the consumer protection act would extend to conversations between friends where one says he knows somebody who might be interested in buying the other's house, car, or baseball card collection.  Simply passing on such information, with no expectation of financial gain, does not amount to "trade or commerce" within the meaning of RSA 358-A.  See Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (noting purpose of RSA 358-A as "to ensure an equitable relationship between consumers and persons engaged in business") (internal quotation marks omitted).

Here, although the complaint does not allege why Flanagan

---

[2] In construing the New Hampshire Consumer Protection Act, courts in this state often look to the body of law surrounding the Massachusetts Consumer Protection Act, "which is similar in many respects to the New Hampshire statute."  Remsberg v. Docusearch, Inc., 149 N.H. 148, 160 (2003); see also Milford Lumber Co. v. RCB Realty, Inc., 147 N.H. 15, 17-18 (2001); Chase v. Dorais, 122 N.H. 600, 602 (1982).

"told the sellers that she had potential buyers who were interested in the property," the Feeneys argue that this act "ha[d] absolutely nothing to do with her job as an investigator and the only reasonably [sic] conclusion is that she was seeking some personal gain through matching the sellers with a buyer for their property."  Mem. Opp'n Mot. Dismiss at 10.  The court disagrees and, in fact, believes that this conclusion does not rationally follow from the facts set forth in the complaint.  In addition to telling the sellers of other potential buyers, Flanagan also advised them to "hold out for a higher price or perhaps develop the property themselves."  Compl. ¶ 44.  Again, the property ultimately sold for $565,000, considerably more than either the Feeneys or Croteau had initially offered.  The Feeneys do not explain how Flanagan would stand to reap any financial benefit if the sellers followed her simple advice to try to get more money for the property.

Furthermore, the purpose of the New Hampshire Real Estate Practice Act, which, inter alia, created the state Real Estate Commission, is "to regulate the practice of real estate brokers and salespersons in order to ensure that they meet and maintain minimum standards which promote public understanding and confidence in the business of real estate brokerage."  N.H. Rev. Stat. Ann. § 331-A:1.  The Commission has the duty to administer

this Act.  Id. § 331-A:5.  In light of these broad purposes, it is unreasonable to infer that Flanagan was acting outside the scope of her responsibilities as a Commission investigator by giving the sellers information suggesting that they had not been provided with reasonable offers for their property.  Moreover, the Feeneys' suggestion that Flanagan should have been "working for them to protect them against any wrongdoing" because they were the ones who initially complained to her, Mem. Opp'n Mot. Dismiss at 10, reflects a profound misunderstanding of the purposes of the Real Estate Commission and, for that matter, the duties of public employees.  Flanagan had a responsibility to investigate the conduct of the brokers and salespersons involved in the transaction, N.H. Rev. Stat. Ann. § 331-A:28, I, not to assist the Feeneys in their effort to acquire the property.

Because the complaint fails to allege facts sufficient to show that Flanagan engaged in trade or commerce through her communications with the sellers, it does not state a claim against her under the New Hampshire Consumer Protection Act.[3]

---

[3] The Feeneys' allegations that Flanagan "abus[ed] her governmental cloak of authority" and "committ[ed] other illegal acts and violations of the real estate code of ethics," Compl. ¶ 55, are the sort of "bald assertions, unsupportable conclusions, and opprobrious epithets" disregarded in assessing whether a complaint states a claim for relief.  In re Credit Suisse First Boston LLC, 431 F.3d at 45.

Conclusion

For the foregoing reasons, Flanagan's motion to dismiss (document no. 15) is GRANTED insofar as it seeks dismissal of the Count V of the complaint, the consumer protection act claim against her.  The motion is otherwise DENIED.

SO ORDERED.

*Joseph A. DiClerico, Jr.*
Joseph A. DiClerico, Jr.
United States District Judge

April 20, 2006

cc:  Donald F. Hebert, Esquire
     Cheryl M. Hieber, Esquire
     Anderson S. Kressy, Esquire
     Andrew B. Livernois, Esquire
     Michael P. Murphy, Esquire